# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF LOUISIANA
# LAFAYETTE-OPELOUSAS DIVISION

| | | |
|---|---|---|
| TAMERA L. PARNELL | * | CIVIL ACTION NO. 07-1901 |
| VERSUS | * | JUDGE MELANÇON |
| COMMISSIONER OF SOCIAL SECURITY | * | MAGISTRATE JUDGE HILL |

## REPORT AND RECOMMENDATION

This social security appeal was referred to me for review, Report and Recommendation pursuant to this Court's Standing Order of July 8, 1993. Tamera L. Parnell, born May 13, 1960, filed applications for a period of disability, disability insurance benefits, and supplemental security income payments on November 21, 2005, alleging disability as of February 11, 2005, due to neck and back problems, headaches, temporomandibular joint disorder, and anxiety.

## FINDINGS AND CONCLUSIONS

After a review of the entire administrative record and the briefs filed by the parties, and pursuant to 42 U.S.C. § 405(g), I find that there is not substantial evidence in the record to support the Commissioner's finding that the claimant was not disabled and that this case should be reversed.

In fulfillment of F.R.Civ.P. 52, I find that this case should be reversed, based on the following:

**(1) Records from Doctor's Hospital of Opelousas dated February 13, 2005**. Claimant complained of pain all over after being assaulted in the Wal-Mart parking lot two days prior. (Tr. 134). She had multiple contusions to her face and neck. (Tr. 136). She refused injections of medication and refused to sign discharge papers. (Tr. 137).

**(2) Records from Dr. Daniel R. Baker dated September 19, 2005 to December 12, 2005**. On September 18, 2005, claimant complained of pain in the low back and lower extremities. (Tr. 141). The assessment was chronic lumbar discogenic pain with lower extremity radiation. She was prescribed Methadone, Lortab, Soma, and Xanax.

**(3) Consultative Psychological Examination by Dr. Sandra Durdin dated February 22, 2006**. Claimant complained of ruptured discs in her back and anxiety. (Tr. 146). She was taking Methadone and Carisoprodol. (Tr. 147).

On examination, claimant was alert and oriented in all spheres. Her pace was accelerated, and her attention and concentration were adequate. She did not listen well, because she talked continually. Dr. Durdin wondered about medication effects in addition to anxiety.

Claimant's speech and language were fully intelligible, and her vocabulary was good. She was moderately anxious. Her recent memory was fair, and overall memory was adequate.

Cognitive skills were adequate. (Tr. 148). Claimant's estimated level of intellectual functioning was considered to be above average. Her thought content and organization were intact. She had no perceptual distortions, and no suicidal or homicidal ideations.

Dr. Durdin observed that claimant was an anxious, but pleasant, polite lady. She claimed to be waiting for back surgery. She stated that he had taken pain medications for years; thus, she had developed tolerance. She had had trauma, which had reportedly made her anxious. She also had the stress of a son with problems and a husband with cancer.

Dr. Durdin's diagnostic impressions were acute stress disorder, probable prescribed opiate dependence, and chronic pain disorder, due to both physical and psychological factors. She found that claimant's ability to understand, remember, and carry out instructions was good. She stated that claimant had fair ability for detailed instructions. Her ability to maintain attention to perform simple, repetitive tasks for two-hour blocks of time was adequate.

Claimant's ability to sustain effort and persist at a normal pace over the course of a 40-hour workweek was fair. Her ability to relate to others, including supervisors and co-workers, was good. Her ability to tolerate stress and pressure associated with day-to-day work activity and demands was fair. She was capable of managing her personal financial affairs.

**(4) Consultative Examination by Dr. Christiane Eisele dated March 25, 2006**. Claimant complained of low back pain and a mandible problem. (Tr. 150). She stated that she had two ruptured discs for which she had been scheduled for surgery. However, the surgery was indefinitely postponed because her records at LSU Charity Hospital in New Orleans were underwater after Hurricane Katrina. She also reported that she was supposed to get her mandibles reconstructed, but had to gain weight in order to get the surgery. Additionally, she complained of diffuse whole body bone pain.

Claimant reported that she had last worked in advertising for a nightclub until June of 2005, and left due to her back problems. She stated that she could dress and feed herself, stand for 20 minutes, walk for one block, sit for 15 minutes, lift three pounds, and drive a car for 15 minutes. Her household chores included sweeping, cooking, and dishes.

Claimant's medications included Lortab 10 every four to six hours, Soma every six hours, and Methadone 40 every six hours. (Tr. 151).

On examination, claimant was 68 inches tall, and weighed 110 pounds. Her blood pressure was 140/84. She was slightly hunched over, but in no acute distress.

Claimant ambulated normally without difficulty. She was able to get on and off the exam table, up and out of the chair, and dress and undress herself without difficulty. Her hearing was normal, and speech was 100 percent understandable.

Claimant had very poor dentition and bilateral spontaneous dislocation of TMJ, which she could put right back in, but it popped and fell back out if she opened her mouth too wide. Her visual acuity without glasses was 20/40 bilaterally.

On spine/extremities examination, claimant had some mild sacral tenderness. She had 2+ radial and pedal pulses. She had no clubbing, cyanosis, or edema.

Claimant had no swelling, redness, or effusion of any joint. Her gait was essentially normal, but slightly slowed. She did not require an assistive device for ambulation. Her grip was 5/5 with normal finger to thumb, and normal ability to button, zip, and pick up coins.

Claimant had slight limitations in range of motion of her spine. (Tr. 152). Straight leg raising supine was 85, and sitting was 90. She was able to lay straight back on the table. She was able to stand on her heels and toes, squat halfway, and

5

walk heel to toe, but with some mild balance difficulty. She had no ulcerations or varicosities.

Mentation was normal with good personal hygiene and appropriate affect. Claimant's motor strength was 5/5 in all proximal muscle groups. Sensory, cerebellar, and cranial nerve exams were normal.

Claimant's lumbar spine x-ray was essentially normal. She had no evidence of osteopenia, and had normal alignment and disc spaces.

Dr. Eisele's impression was a history of some degenerative disease. He noted that claimant's cooperation was appropriate, and that she had minimal limitations in her range of motion. However, she did take "extremely large" amounts of narcotics and pain medication, which he believed could be why her exam was so unremarkable, other than for her thinness.

Dr. Eisele found that claimant's most remarkable aspect of her examination was her TMJ, but that the looseness of her TMJ was "nothing short of bizarre" and fairly rare to dislocate so frequently. He noted that her jaw was essentially so loose that she would certainly require intervention at some time. She also had some issues with nutrition from her TMJ, as she was unable to ingest anything other than liquids. (Tr. 153).

**(5) Report from Oral and Facial Surgery Center dated March 31, 2006**. Dr. Phil Mayers noted that claimant had severe TMJ disorder. (Tr. 154). He stated that she needed to see an oral surgeon.

**(6) Medical Evaluation by DDS physician, Dr. Peter Sotiriou, dated May 1, 2006**. Claimant complained of low back pain with two ruptured discs. (Tr. 155). She attended her personal hygiene with some difficulty and slowly. She did some household chores, and did not drive. Her lifting was particularly restricted. She used a brace.

The diagnosis was herniated lumbar discs (by history). Dr. Sotiriou noted that claimant was complaining of pain and was taking medications. He stated that the description of the disc abnormalities and arrangements for surgery were "unlikely to be a complete fabrication." Giving claimant the benefit of the doubt, he assumed that some back pain existed which caused moderate limitations in activities of daily living, and that claimant was taking medications. Otherwise, he found that her restrictions were not significant. His assessment was that the impairment was severe.

In the Residual Functional Capacity Assessment (Physical), Dr. Sotiriou found that claimant could lift/carry 50 pounds occasionally and 25 pounds frequently. (Tr. 157). She could stand, walk, and sit about six hours in an eight-hour workday. She had unlimited push/pull ability.

Claimant could frequently perform all postural activities, except that she could never climb ladders/ropes/scaffolds. (Tr. 158). She had no other limitations. (Tr. 159-60).

**(7) Psychiatric Review Technique Form dated May 1, 2006**. Claimant was assessed for anxiety-related and somatoform disorders. (Tr. 164). Dr. H. Thomas Unger determined that she had mild restriction of activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace. (Tr. 174). She had insufficient evidence of episodes of decompensation.

**(8) Records from Dr. Daniel Baker dated September 19, 2005 to October 30, 2006**. Dr. Baker treated claimant for chronic pain syndrome. (Tr. 181-219). He prescribed Methadone, Lortab, and Xanax.

**(9) Report from Dr. Jack Loupe dated October 30, 2006**. Claimant complained of low back pain, shooting pain into the lower extremities, and numbness in both legs. (Tr. 225). She was taking Methadone once a day and Hydrocodone twice a day. She complained that it made her somewhat nauseated.

On examination, claimant appeared to be having considerable stiffness in her lower back, and did not like to sit or stand too long, changing from one to the other.

Later during the exam, she did not seem to have this problem at all. She walked with a very slow gait in the exam room.

Lumbosacral examination initially showed that claimant was forward listing about 15 degrees. During the examination, she was able to straighten up. She had no paraspinous muscle spasm, list, or scoliosis.

Lumbar lordosis was preserved. (Tr. 224). Claimant forward flexed the lumbar spine very slowly but fully. The lumbar curve reversed, which she said was painful. She straightened up slowly as if having mechanical dysfunction. Right and left lateral bending and hyperextension were carried slowly and said to be painful.

Straight leg raising was negative to 95 degrees. When claimant was seated on the exam room table and was removing her long boots, she reached down fully without hesitation to remove the right one.

Neurological examination showed 2+ ankle and knee jerks. Give way weakness of the foot extensors and left quadriceps was present on the first three or four tries, until Dr. Loupe insisted that claimant to use full effort. She had no neurological weakness.

Claimant had decreased sensation in both lower extremities from the mid-thighs on down. She had a full range of motion in the hips. She complained of lower back pain with resisted quadriceps on the left.

X-rays of the lumbar spine showed five unribbed mobile lumbar vertebrae, a mild scoliosis to the left with apex at L3-4, but involving 4-5 somewhat acutely, anterior lipping at L2-3 and L3-4, and trophism of the L4-5 facet joints. She told Dr. Loupe several times during the exam that her tailbone was completely gone, but he found no evidence of any abnormality. X-rays of the pelvis, hips, and sacroiliac joints showed no abnormality.

Dr. Loupe's diagnoses were chronic upper and lower lumbar pain for several years, worse after the attack; probable degenerative disease of the lumbar spine; mild but significant scoliosis at L3-4 and L4-5 to the left; trophism of the L4-5 fact joints; painful jaws since being attacked; chronic cigarette smoking for 30 years; a history of seizures and cluster headaches; a history of tremors of the lower extremities; dependency on Methadone and Hydrocodone, and chronic pain syndrome. Dr. Loupe explained to claimant that he was not sure what was causing her to have pain sufficient enough to require narcotic pain medication. He found that she did have evidence of degenerative disc disease and mild scoliosis, which could cause some pain. He recommended further evaluation with an MRI. He did not believe that any treatment other than proper care of the back was going to be necessary.

**(10) Records from Brad Davis, D.D.S., dated September 5, 2000 to January 9, 2002**. Dr. Davis wrote that claimant had TMJ dysfunction and required treatment

by a specialist. (Tr. 230).

**(11) Report from Southwest La. Primary Health Care Center dated September 12, 2005**. Claimant complained of a herniated disc, which was scheduled for surgery in three weeks. (Tr. 232). She needed Methadone. The assessment was a herniated disc and a bone disorder. She was referred to a pain management specialist.

**(12) Emergency Room Records from Opelousas General Hospital dated May 18, 2005 to April 11, 2007**. On May 18, 2005, claimant was seen for facial and mouth pain and swelling. (Tr. 278). The diagnosis was dental abscess. (Tr. 279, 282).

Claimant was seen on May 20, 2005 for shortness of breath. (Tr. 273). The assessment was pneumonia, GERD. (Tr. 276).

On May 20, 2006, claimant was seen for acute pain in the mandible. (Tr. 257). The assessment was dental infection.

A lumbar MRI dated January 5, 2007 showed broad-based disc bulges at the L2-3, L3-4, and L4-5 levels mildly indenting the thecal sac, and a broad-based disc bulge with a tiny central protrusion and annular fissure at the L5-S1 level minimally indenting the thecal sac without significant central spinal canal or neural foraminal stenosis. (Tr. 255).

On April 11, 2007, claimant complained of right arm numbness with weakness and syncope. (Tr. 238). An ECG showed sinus arrhythmia. (Tr. 240). A cervical MRI showed mild to moderate narrowing at the inferior aspect of the right neural foramen; a C5-C6 superimposed disc extrusion with lateral recess stenosis, greater on the right, with moderate left and moderate to severe right foraminal stenosis, moderate canal stenosis, and mild indentation of the anterior right surface of the cord, and C6-C7 moderate canal and foraminal stenosis. (Tr. 244). The impression was near syncope/radiculopathy. (Tr. 234-36).

On May 6, 2007, claimant complained of shortness of breath. (Tr. 249). The assessment was dyspnea and COPD, acute exacerbation. (Tr. 250).

**(13) Report from James A. Pearce, D.D.S., dated November 15, 2001**. Claimant complained of bilateral mandibular pain and locking, headaches in the temporal region with mandibular and auricular pain radiating into her face, a history of jaw locking for several months, and a history of nocturnal bruxism and clenching of her teeth. (Tr. 286). She presented with bilaterally displaced discs of her TM joints and quite a bit of wear, especially on her anterior teeth. Dr. Pearce recommended a complete evaluation of claimant's masticatory apparatus, and placed her on a soft diet and moist heat.

**(14) Report from Dr. Vikram S. Parmar dated May 30, 2007**. Dr. Parmar wrote that he had reviewed claimant's MRI of the cervical spine. (Tr. 331). He opined that she would need surgical intervention based on his review. He stated that he was willing to do the surgery, provided claimant received a medical card.

**(15) Claimant's Administrative Hearing Testimony**. At the hearing on June 18, 2007, claimant was 47 years old. (Tr. 335). She was 5 feet 7 inches tall, and weighed 115 pounds. She had a driver's license, but did not drive due to her medications. She had completed high school.

Claimant testified that she had last worked in 2005 running a nightclub. (Tr. 336). She had been employed there for 15 years.

Claimant testified that she was taking medications, which helped her symptoms. She complained that she had side effects, including tiredness and dizziness. (Tr. 336, 342). She was also taking Xanax for anxiety and inhalers for asthma. (Tr. 345).

As to restrictions, claimant testified that she could walk for 10 minutes without having to take a break. (Tr. 337). She stated that she could stand for 10 to 15 minutes. She reported that she could not stoop or squat.

Claimant said that she had numbness in the right side of her arm and leg. She stated that she could not lift more than three pounds. (Tr. 338). She reported that her

tailbone was gone, so sitting was painful for more than 10 to 15 minutes.

Claimant stated that she did limited housework. She said that she watched television for about two hours a day. (Tr. 339). She reported that she usually slept in because of her medications, but had trouble sleeping due to pain. (Tr. 339-40). She testified that people from the church came by to check on her. (Tr. 340).

As to complaints, claimant testified that she had deterioration of the bones from a hereditary disease. She said that she had been scheduled for surgery in New Orleans, but that the records were missing after the hurricane. She also complained of very severe TMJ problems. (Tr. 341).

Additionally, claimant reported neck problems. She stated that she had a dizziness problem with it. (Tr. 342). Further, she testified that she had cluster headaches. (Tr. 343).

**(16) Administrative Hearing Testimony of William Stampley, Vocational Expert ("VE")**. Mr. Stampley classified claimant's past work as a nightclub manager as light and skilled, a hostess as light and semi-skilled, and a bartender as light and semi-skilled. (Tr. 349). The ALJ posed a hypothetical in which he asked the VE to assume a claimant who was 47 years old with a high school education, and was limited to standing or walking for 10 minutes at a time after being seated for 10 minutes, alternating either sitting/standing or walking for 10 minutes. (Tr. 349). In

14

response, Mr. Stampley stated that claimant could not return to her past work. However, he opined that with those limitations, she could perform sedentary work as a taxi cab dispatcher, of which there were 1,126 positions statewide and 81,827 nationally; addresser, of which there were 351 positions statewide and 25,954 nationally, and telephone solicitor, of which there were 2,647 positions statewide and 321,707 nationally. (Tr. 349-50). When the ALJ added claimant's need to take naps three times a day because of her medications, the VE testified that such claimant would not be able to perform those jobs, or any other jobs. (Tr. 350-51).

**(17) The ALJ's Findings**. Claimant argues that the ALJ erred in assessing claimant's residual functional capacity at Step 4, resulting in a determination at Step 5 that was erroneous and unsupported by the totality of the evidence. Because I find that the ALJ failed to properly evaluate the combined effect of her impairments, as well as the side effects of her medications, I recommend that this case be **REVERSED,** and that claimant be awarded benefits.

Claimant specifically argues that the ALJ dismissed her complaints of facial pain and headaches. [rec. doc. 8, p. 4]. The ALJ noted that claimant had experienced ongoing problems with her TMJ, for which she clearly needed medical treatment, but had not alleged a significant degree of pain or discomfort with this problem. (Tr. 18). He also observed that she had complained of headaches, but discounted this because

"these could just as well be related to her neck problems as to her jaw, and there is no evidence linking same." Such statements are contrary to the reports from claimant's physicians, as well as claimant herself.

It is well established that the opinion of a treating physician who is familiar with the claimant's impairments, treatments and responses, should be accorded great weight in determining disability. *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000); *Leggett v. Chater*, 67 F.3d 558, 566 (5th Cir. 1995); *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994), *cert. denied*, 514 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (1995). A treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with ... other substantial evidence." *Newton,* 209 F.3d at 455 (citing 20 C.F.R. § 404.1527(d)(2)). Good cause for abandoning the treating physician rule includes disregarding statements by the treating physician that are brief and conclusory, not supported by medically accepted clinical laboratory diagnostic techniques, or otherwise unsupported by evidence. *Leggett*, 67 F.3d at 566; *Greenspan*, 38 F.3d at 237.

Here, several physicians found that claimant had severe jaw problems, as well as headaches. Dr. Eisele noted that had very poor dentition and bilateral spontaneous

dislocation of TMJ, which she could put right back in, but it popped and fell back out if she opened her mouth too wide. (Tr. 151). He found that the looseness of her TMJ was "nothing short of bizarre" and fairly rare to dislocate so frequently. (Tr. 152). He noted that her jaw was essentially so loose that she would certainly require intervention at some time.

Additionally, Dr. Phil Mayers stated that claimant had "severe" TMJ disorder and needed treatment by an oral surgeon. (Tr. 154). Dr. Brad Davis also wrote that claimant had TMJ dysfunction and required treatment by a specialist. (Tr. 230).

Further, claimant was seen for facial, mouth pain and swelling on two occasions at Opelousas General Hospital. (Tr. 257, 278-82). She also complained to Dr. James Pearce of bilateral mandibular pain and locking and headaches in the temporal region with mandibular and auricular pain radiating into her face. (Tr. 286). In light of this evidence, the ALJ's finding that claimant has not alleged a "significant degree or pain or discomfort" from her jaw problem is not supported by substantial evidence.

Additionally, the ALJ noted that despite claimant's ongoing complaints of back pain, she had not exhibited motor, sensory, neurological, reflex, or circulatory deficits on examination, citing Dr. Loupe's report. (Tr. 15). However, Dr. Loupe's examination occurred prior to the taking of claimant's MRI, which showed mild to

17

moderate narrowing at the inferior aspect of the right neural foramen; a C5-C6 superimposed disc extrusion with lateral recess stenosis, greater on the right, with moderate left and moderate to severe right foraminal stenosis, moderate canal stenosis, and mild indentation of the anterior right surface of the cord, and C6-C7 moderate canal and foraminal stenosis. (Tr. 244). Based on his review of the MRI, Dr. Parmar opined that she would need surgical intervention. (Tr. 331). Thus, the ALJ's finding that claimant's pain was not "debilitating" and did not "preclude the ability to work" is unsupported by substantial evidence. (Tr. 17).

Further, the record reflects that while the ALJ acknowledged that claimant was taking Methadone and Lortab, he failed to properly consider any side effects from those medications. (Tr. 14). These are both narcotic medicines designed for the relief of moderate-to-severe pain. Under the regulations, the Commissioner is required to consider the "type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate [] pain or other symptoms." *Crowley v. Apfel*, 197 F.3d 194, 199 (5th Cir. 1999) (citing 20 C.F.R. § 404.1529(c)(3)(iv)).

Claimant testified that these medications made her tired, dizzy, drowsy, and unable to focus. (Tr. 336, 342). She also stated that she had to take two or three naps a day when she took her pain pills. (Tr. 343). The vocational expert testified that if claimant had to take naps three times a day because of medications, then she would

not be able to work. (Tr. 350-51). The ALJ did not take the side effects of claimant's medications into consideration, and his failure to do so was error.

Accordingly, it is my recommendation that the Commissioner's decision be **REVERSED**, and the claimant be awarded benefits. The undersigned recommends that and the claimant is awarded appropriate benefits commencing February 11, 2005, the date of onset of disability.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN TEN (10) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT,**

**EXCEPT UPON GROUNDS OF PLAIN ERROR.** *DOUGLASS V. UNITED SERVICES AUTOMOBILE ASSOCIATION*, 79 F.3D 1415 (5TH CIR. 1996).

Signed November 10, 2008, at Lafayette, Louisiana.

*C. Michael Hill*
C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE